Okay, our next case for argument is Center for Biological Diversity v. Shanahan 18-16836 Good morning, and may it please the court, Danny Thieman on behalf of Appellants, Center for Biological Diversity, other US and Japanese conservation organizations, and three individuals who live and work in Okinawa, for whom the dugong has long-standing cultural significance. Your Honor, if I may, reserve two minutes for rebuttal. Sure. Thank you. The issue on appeal is whether it was arbitrary and capricious for the Department of Defense to determine, under Section 402 of the National Historic Preservation Act, whether the Futama replacement facility would have no adverse effect on an endangered species, the Okinawa dugong. Before we get to that, Mr. Thieman, would you indulge me for a second and tell me why the respondent here cannot rely on a claim of error by the district court in its 2005 ruling that the dugong was not property under the national and HPA. Can you tell me why that? If the dugong is not property, then that's a separate basis upon which to affirm summary judgment, correct? It is an alternative ground for affirmance, correct. And the reason why they may not is that this circuit has a rule of practice called the cross-appeal rule, in which a party may not raise an argument that affects the rights of the parties without noticing a cross-appeal. Now, this is de novo review, so the court does have the cross-appeal argument deals with whether the rights of the plaintiff will be otherwise shrunk or the rights of the defendant will be otherwise enlarged. But here, if the dugong is not property, that case only involves, that issue only involves this case and only the dugongs. So why wouldn't that be a basis for our determination? It's not really a cross-appeal, is it? Respectfully, we would disagree with that because... You think it's a cross-appeal, okay. I've got your position. I don't want to take up more of your time. Correct. The defendant's argument would diminish plaintiff's rights because there's an information-forcing benefit of the statute that comes out of consultation, and they would be precluded from suing under section 402 in the future for... Well, the district court's opinion is not presidential beyond this case. Correct. And so even if one district judge... That would be in other cases, but it wouldn't it wouldn't change the facts or the rights in this case, would it? It would change the party's, the plaintiff's ability to engage in meaningful consultation. So, but even if the court were to consider their argument, this court should affirm the district court's 2005 ruling that section 402 applies to the dugong. The dugong is indisputably a cultural property on Japan's historical register, and that historical register is the equivalent of its U.S. counterpart. The section 402 applies to, quote, a property that is on the World Heritage List or on the applicable country's equivalent of the National Register. So to understand... The Okinawa dugong is there in the Japanese equivalency. That is correct, Your Honor. So to understand if section 402 applies to the dugong, the district court correctly noted that both the text and purpose of the statute clearly point to comparing the equivalence of the U.S. and Japanese registries, rather than comparing the dugong to individual properties on the U.S. list. Here in this case, the two registers are equivalent for all the reasons the district court lays out at Excerpt of Record 103 through 108. They share similar motives, share similar goals, and generally pertain to similar types of property. They are broadly equivalent in their purposes. In this appeal, the Department of Defense argues that while section 402 does not apply because the dugong is not similar to an object significant in American history, but the court need not engage in this analysis. As the district court properly pointed out, the focus is on a property's actual inclusion on a foreign registry and whether that registry is the equivalent of its U.S. counterpart. And also the government gave up that appeal about non-property of the dugong in 2015. Correct. They failed to notice the cross-appeal in 2015, and there the court similarly noted that it was not considered the argument. So here, the dugong... Not that they can't bring it up under the... another... for another reason. Well, we would disagree with that, as mentioned, for the reasons laid out in our reply brief. But here, the dugong is indisputably a cultural property on Japan's historical registry. We agree with the district court's reason that that Japanese registry is the equivalent of its U.S. counterpart, and therefore section 402 applies. On the question of whether the Department of Defense complied with section 402, just to highlight here, the text of the statute requires the Department of Defense to, quote, take into account the effect of the undertaking. And the Department of Defense noted that effect has both a biological and cultural component. There is one source in the record on cultural effect, and that is the Welch Report. And here is what the Welch Report does and does not do. The Welch Report interviews 16 individuals about the dugong's historical significance, never informing the individuals that the purpose is to understand how construction or operation of this facility will affect the dugong. And the summaries of the transcripts show the Department of Defense never discussed the Futami replacement facility with these individuals at all. The Welch Report then goes on after a literature review and visits to some local museums to conclude that there will be little direct cultural effect on the dugong. In arriving at this conclusion, the agency has failed to take into account the view of the host nation or relevant organizations or individuals. And the district court points out that this is, quote, a weakness in the take-into-account process. The Japanese environmental assessment, which the district court points to as a way to cure this weakness, is insufficient as it contains no one's views on cultural effects. In the Department of Defense's own words, the Japanese environmental assessment was, quote, not expected to address effects on cultural resources in a manner that this court has determined is required by the Department of Defense. The question bears out, if you look to the Department of Defense's 2014 findings and their discussion of cultural effects, they cite, they don't cite to the environmental assessment, and they don't cite to any engagement with the host nation at all. That's that excerpt of Record 166. So the, it was arbitrary and capricious to determine cultural effects without consulting anyone on their views on what those effects are. But they had the report. The Welch Report. DOD had the Welch Report. That is correct, Your Honor. And as... No reason I think they didn't read it or understand it. Oh, for sure. We do not dispute that. But what we dispute is that that Welch Report's entire cultural effect determination never took into account the views of anyone other than their own experts. I thought they were on your list, some of those experts. That is correct, Your Honor. Two of them were on our list, and they are two of the 16. And just like all the other 16, they were never asked about the Futema Replacement Facility. The agency never said, will this facility have a cultural effect on the dugong? Now, the, although there's no binding regulation requiring the Department of Defense to consult specifically with plaintiffs to remedy this deficiency... Can I ask you, before you finish, could I just ask you a question? Is there anything in the record that explains what they would have said had they known that this was all arising in connection with the Futema Replacement Facility? Yes, Your Honor. On cultural, on the cultural aspects of this? Yes, Your Honor. Plaintiffs submitted declarations showing that they provide cultural tours in the areas around the base and that this construction and operation is making it more difficult to do those tours and the... Would it have an impact on tour, on the ability of tourists to see, or... And as we stated in our reply brief, one of the fallouts of this is that it's making it harder to pass on the dugong's cultural significance to younger generations. And if I may just briefly note, this is an important question that came up in our 2017 appeal. And there, this court stated in the context of redressability that it would, it would be improper to prejudge the outcome of consultation to say that plaintiffs can't offer any information that would change their decisions if where the process of consultation itself is meaningful. That's at 868 F3rd at 820. Similarly here, we would argue that the Department of Defense's position that we can't offer any information that would change their mind prejudges improperly the meaningfulness of engaging in that consultation in the first place. So, although there are... Let me ask you this. Well, one of the things that struck me when I was reading about this case, there are no regulations here. Is that right? There are no regulations on Section 402. The district court in 2008 found that there must be though some minimum requirements. What does take into account mean? Right. And I would like to just highlight that in the Department of Defense's brief, they do not challenge the 2008 order saying that there should be some minimum requirements here. And those minimum requirements are the following. That the district court found that the agency must gather and collect information on the effects of the military facility in cooperative partnership with the host nation, relevant organizations, and individuals, which they did not do. By failing to engage affected individuals such as plaintiffs, they fail to meet even these minimum requirements of the statute. And Judge Patel in the 2008 order arrived at these minimum requirements by engaging in some standard statutory analysis. She compared identical language in Section 402 with language in 106, which is the take into account provision. As the Department of Defense states in its own brief, a similar language or identical language in a statute should be given similar meaning. So that's exactly what Judge Patel did here to find that, okay, the agency should at least collect information on effect with the host nation and affected individuals. Here the Department of Defense's own experts stated or advised consulting with individuals such as plaintiffs because otherwise their process would be, quote, really weak in understanding effect. That's an excerpt of Record 359. The plaintiffs in the so here the Department of Defense never informed affected individuals that it was engaging in its take into account process until it was over and its findings were complete in 2014. Well, there's no notice requirement in 402. There is no notice requirement. However, we would argue that under Judge Patel's 2008 order, which the Department of Defense does not, if I understand them correctly, to be disputing, then they should at least engage plaintiffs, give them a chance to comment or somehow provide their views. I mean, these are the folks who are, for whom the dugong is culturally significant. By affording no one, no affected individual the chance to comment on effect, the agency does not take into account the effect of the undertaking as required by Section 402. Let me ask you one other question. You had a at least I thought there was an argument that DOD didn't really make a determination of the baseline. That is the number of Correct, Your Honor. And that is dugong in this area. Correct, Your Honor. And that is although there's some information in the record that suggests that there are very few dugong in this area. Correct, Your Honor. And that that's the last point I would like to address if I may. So the Department of Defense's entire findings on the biological well-being of the dugong rests on one key assumption. And that is the extremely low probability of dugong being in the area of potential effect. The Department of Defense and the District Court state that the Department of Defense has a valid data for this key assumption. I see I'm running out of time. So I would just like to state that the Department of Defense's own experts reject this, saying there's there's no valid data make this key assumption. They say, quote, evaluating the actual overall effects of the Futema replacement facility at this point is not possible, as the detailed studies that could provide baseline information that we need have not been conducted. And the record is uniform in this critique of the science. The notion of baseline usually arises in the context of environmental cases. I mean, this isn't really a pure environmental case. It's not purely an environmental case, Your Honor. That's correct. But as this court stated in Oregon Natural Desert Association, deference to an agency does not excuse it from ensuring the accuracy and integrity of its analysis. So where the Department of Defense's experts are stating that there's no studies on, quote, the numbers of dugong using the Futema replacement facility area, it is impossible to determine accurately the adverse impacts. That's also excerpt of Record 317. We would submit that they have... Let me ask you, is there any information in the record that suggests that the DOD's kind of assessment that there are very few dugong in the area, that there's just no basis for that? I mean, is there any evidence in the record that suggests this is a place where the dugong can readily be seen and where they hang out? I understand two questions there. On the last point, yes, there are feeding trails showing that dugong use this area to feed, but the Department of Defense's own experts state that they don't have the studies to actually know, are the three to 50 dugong that are remaining and alive using this area with any frequency? They don't have the studies to do that. I see I'm out of time. I'll give you a minute or two for rebuttal. Thank you, Your Honor. May it please the Court, good morning, Your Honors. John Smeltzer for the Department of Defense. Your Honors, we asked this Court to affirm the District Court's ruling for two reasons. First, the DOD conducted an extensive review of the impacts of the Futama Replacement Facility on the dugong and ways to mitigate those impacts. The review was more than sufficient to meet the modest standard of Section 402e of the National Historic Preservation Act. And secondly, and more fundamentally, Section 402e does not apply to the circumstances of this case. Your Honors, first, let me just briefly say that we did not need to cross-appeal to raise both of these questions. The bedrock rule of an appeal is you can defend on any grounds, defend the judgment on any grounds that were argued below. The judgment in this case was the 2018 judgment that was entirely in favor of the United States. And I just wanted to make sure that I addressed Judge Jack's question about the 2015 final judgment. The plaintiffs don't argue here that we had to raise this merits issue in 2015. They're saying simply we had to cross-appeal from the 2018 judgment, which was entirely in our favor. So the bedrock rule applies. And of course, when this Court decided the 2015 decision, they dropped a footnote and they explained it was a jurisdictional case and the merits issues really weren't properly present there. Now we are at the merits issues. This was a rationale that was provided or that was argued below by the United States as to why the NHPA, you know, why we didn't need to do what the plaintiffs said we needed to do. And it's fully before the Court at this point. So let me move quickly to the question. It is a discretionary determination with us, though, isn't it? It's discretionary with the Court if the Court finds this is the kind of case that we should have cross-appealed on. We don't even get to that discretionary question. But if you get there, Your Honor, for whatever reason, we think these issues are interrelated. There was no prejudice to the plaintiffs. They had the full opportunity to brief the issues. And we were not aware from the judgment, which was entirely in our favor, that we needed to cross-appeal. But going to the question, the fundamental question as to whether the Section 402e of the NHPA applies to this case, the critical portion of the statute, we agree, is the section that says the NHPA applies to property on the applicable country's equivalent of the National Register. Of course, the National Register is a national register of historic places. Which are broken down by our statute into districts, sites, buildings, structures, and objects, all places. Now, what Japan's list is, is something more than that. It includes buildings and structures and places, but it also includes plants. It includes animals. It includes books. It includes calligraphy. It includes manners. It includes music. It includes a whole bunch of things that we would not consider to be property under the NHPA. They're not places. So the two lists are not equivalent. So what plaintiffs say you have to do is you have to take the entirety of the list, even though the lists aren't equivalent. But we say that would read the term equivalent out of the statute. Another way you might look at it, you can say, well, Japan doesn't have an equivalent list, so none of the items on Japan's list are included, even the places. Now, we don't think that makes any sense, because obviously Japan does have some items on their list that correspond to our list. We simply say that the reasonable way of reading the plain language of the statute is you take our list of places to define, you know, what the statute's about, and then you take Japan's list of places, right? Everything on Japan's list that's a place corresponds with our list, and that is Japan's equivalent of our National Register of Historic Places. Now, in saying that, Your Honor, we're not saying that we're imposing some sort of American values on what Japan can put on their list, right? We're just saying they have to be places as well. We have criteria that we use for our National Register of Historic Places that apply to the places on our list. Japan may have their own criteria that are very different than our criteria, but we're just saying for purposes of this statute, it's a statute about culturally and historically important places. What's the harm to DOD to call the dugong a property under Japanese cultural? Your Honor, I mean, the harm is it imposes a burden, right, on the agency to conduct what the plaintiffs would have us do is essentially, and I think this goes to a question that Judge Piatt asked, sort of, you know, the NHPA is not really an environmental statute. But to get a real indication of what kind of impact you're having on a species, as opposed to a fixed place, it raises a whole host of questions that, you know, for example, if Your Honors are familiar with the Endangered Species Act and the obligations that that act imposes on agencies in order to determine, you know, viability of a population, whether a population is actually a separate population, a sub-population, or the population as a whole, you know, what are the baseline numbers for the population, all the sorts of things they're asking us to do in this case are very stringent sorts of standards that if they're applied in the context of Section 402e, they terrifically increase the burden, at least as the plaintiffs would have the statute applied on United States agencies. And of course, we have our own Endangered Species Act, right? We have our own Marine Mammal Protection Act. The plaintiffs aren't relying on those acts because those acts, they understand, do not apply in the territorial waters of Japan. And what the plaintiffs are asking us to do is to take a square peg of the NHPA, which applies to places, and pound it into the round hole of, in this circumstance, which it doesn't fit, because we're talking, dealing with animals, and we're dealing with species, and that kind of evaluation is just not readily done under the standards that ordinarily apply to, you know, determination of adverse impacts. So let me turn, if the Court is interested in the issues about compliance, because there's an equally important statutory question there as well. Plaintiff's counsel stated that the United States does not dispute, or the Department of Defense did not dispute, the standard that the district court set in 2008 for what level of consultation would have to apply for us to comply with our obligation on Section 402e, and that's simply not true. And so let me clarify what we're trying to say here. As Judge Paez pointed out, I believe, this is a statute that has very few words. It says, take into account adverse impacts, and that's pretty much it. There's no regulations that apply, and there are no further statutory provisions that apply to that. So if the dugong is not property, what is your obligation to do anything about the dugong? Right. I've moved on, Your Honor. I'm happy if you accept our first argument that this statute doesn't apply. What I'm saying is, if the Court accepts the notion that the statute does apply, right, the Court has to understand that the statutory requirement is very limited, or very modest, I guess, is perhaps a better way to put it, because it's simply that the language of the statute is all you have. The plaintiff's theory and the district court's theory is that because the domestic counterpart, right, of Section 402e contains the same three words, take into account, that somehow that we need to incorporate all of the consultation and public notice requirements of the domestic requirements. But that's just not correct, Your Honor, because there's a fundamental distinction between Section 402e and Section 106, which governs the domestic law. In Section 106, there's a sentence that says, take into account, period. Then there's another sentence that says, in the domestic context, federal agencies have to allow the Advisory Council on Historic Preservation the opportunity to comment. And then there's a separate set of rules that governs the Advisory Council. And those rules say the Advisory Council must include local agencies when they do their commenting process. And it also says that the Advisory Council may generate regulations to govern their involvement in this process, that is, the involvement of the Advisory Council. So the Advisory Council has gone off and promulgated a whole bunch of rules to govern their involvement, right, in this process, which is mandated under Section 106. 106 says you have to allow the Advisory Council in. The Advisory Council has provided this full suite of procedural regulations that you have to comply with, including rules about contacting local agencies and public participation. But that all comes from the mandate in the statute in Section 106 that says you must allow the Advisory Council to comment. That doesn't come from the plain meaning of three words, take into account, right? Take into account simply means to consider. And what we submit to this court is the Department of Defense reasonably may consider the effects of the Futama replacement facility on the Dugong without doing what they insist we have to do. That is to go and do some sort of local consultation with locals who might be impacted or some sort of public proceeding locally in Japan. And we also submit, Your Honor, there's a fundamental reason why, right, the statute has the requirement in the local context and not in the international context. And that is because it's one thing to tell a federal agency, right, to go consult with local governments and with state governments and do public notice comment within the United States. That's something we do standard all the time. It's something fundamentally different to say to federal agencies that you have to do that kind of level of consultation with local governments for actions that happen. Let me ask you this, how would DOD, let's assume it applies, what does it mean? What is the minimal amount that's acceptable? To reasonably take into account? Yes. To figure out, you know, what are the impacts? And I don't think we would dispute that we need to work with the host nation, and that's where I was going. In diplomatic international context, you ordinarily, you know, it's a nation-to-nation relationship. And, of course, the plaintiffs put in the record the report. I hear Japan might say, well, you know, why don't you talk with the people on Okinawa? Well, Japan didn't say that. Well, I mean. Which describes the very complex local politics of this issue on the island of Okinawa. There is not a secret that the people of Okinawa and the nation of Japan disagree over this. And so it would be a very sensitive thing for DOD to march in and try to do some, you know, local notice and comment on what are the adverse effects of this facility. At the same time, Japan is doing their own work under their own statutes. And we are consulting with Japan. And what we're saying is that Congress didn't dictate that DOD had to go do these local things, because in the international context, that would be highly unusual. It would get in the way of our standard diplomatic nation-to-nation relations. Let me ask you this about the baseline. Sure. To really understand the effects, wouldn't DOD also have to understand, you know, is this a place where one might find a number of dugong? Yes, absolutely. Or this is a place where they're just, they just kind of, you know, buzz by every now and then? Yes. And there's a ton of data in the record, Your Honor. The survey data goes back to before 2000. The Japanese Ministry of the Environment did surveys from 2000 to mid, certainly 2000, 2003. And there are other surveys in the record from Japan in 2000, between 2003 and the point where they started the environmental impact assessment, which was essentially 2008 and 2009. In 2008 and 2009, they did a bunch of different specific survey methods. They did track line aerial surveys, where they just went back and forth, back and forth, up and down in a systematic way on the coastline. They did the entire coastline for the EIA, but also at the target area around the Futama replacement facility. And they did helicopter tracking. If they saw a dugong, they immediately sent out a helicopter to follow the dugong, to try to figure out where the dugong was going. They also did manta surveys, which are surveys where they trail divers from a boat, and the diver looks for information. They also did passive acoustic monitoring to look for dugongs. They have photographs. They have video. They did it, and they continued to do, then, these aerial surveys right in the areas, all the way from 2009 up to the time that the DOD made its findings. And what the record shows is, from all of those surveys, is that the dugong activity on the east coast of Okinawa was mostly concentrated up in Keio, which is an area north of Ora Bay, but away from the replacement facility. And there was some sporadic use of the area down by Hinoko Bay and Hinoko Point. DOD acknowledged that, but the activity was much more frequent, much more consistent up in this area to the north. And that, there's, I mean, there's just a ton of evidence in the record to show that. That's different than saying, do we have enough evidence, do the scientists have enough evidence to say, you know, what is the overall population in the Ryukyu Islands of the dugong, or in Okinawa in general? Is this population viable? What needs to be done to do a recovery plan? Those are the broader issues that one would have to do to get an overall impact on the species. What DOD understood its obligation to be under the NHPA was to do a specific targeted look at this site, because again, NHPA is ordinarily focused on places, right? So looking at this site where the Futema replacement facility is being constructed, you know, are there dugongs, and how many, and are they going to be impacted? And what they found is sporadic use, these feeding trails, but by and large, the vast  majority of the sites are not affected by DOD. Before you, I have a couple other questions for you. Council argued very strongly that DOD did not take into account the cultural ramifications. What's your response to that? You know, we did an extraordinary, the Welch Report was commissioned by DOD. That wasn't just DOD reading a report, DOD commissioned that report. And that was archaeologists, anthropologists, and a biologist working with experts from the importance of the dugong to the people of Okinawa. It's an extraordinarily comprehensive report, over 100 pages long. We provided a lot of it for the court in our excerpts, but clearly it was sufficient to take into account the importance of the dugong had to Okinawan people, and they also weighed that in the findings, Your Honor. What they specifically found with respect to the findings was there were no cultural practices specific to Honoko Bay, and there's been no indication that there are, from plaintiffs, cultural practices in the bay. What they keep referring to are ecotourism, right, and the area right around Camp Schwab, where the facility is going to be, is already closed to ecotourism. So it's not going to affect the people that go out into the bay, because they can't access the water areas where the construction is going on now. Okay. I think I understand. Thank you, Your Honor. Let's see, counsel, I'll give you a minute or two for rebuttal. Thank you, Your Honor. I appreciate that. The purpose, again, of Section 402 is to ensure that the Department of Defense does not trample on property that Japan has deemed culturally significant. So the Department of Defense's argument that they will pick and choose which properties to take into account defeats the purpose of this statute. Secondly, we're not asking for Endangered Species Act standards to apply here today. We're asking simply that the Department of Defense take into account, as the text of the statute requires, as interpreted by Judge Patel in 2008, according to those minimum standards. The Department of Defense, in its remarks today, agreed that a minimum effort required is to take into account effect. By failing to ask anyone what the Futenma replacement facility's effects will be, they have failed to take into account the effect. And lastly, Your Honor, the Department of Defense spent a lot of time talking about survey data to understand if dugongs are in this area. However, the Department of Defense's own expert, Dr. Jefferson, specifically rejects this data. It cannot be relied upon. Dr. Jefferson states that the Japanese environmental assessment surveys are – do not withstand scientific scrutiny, in my opinion. The record could not be more uniform in its critique of these survey methods. Dr. Jefferson states that the surveys for site-specific impacts are totally inadequate. So the Department of Defense cannot rely on these survey methods. The Department of Defense's own experts say that there's problems with the survey methods and they cannot be relied on for a determination of effect. Thank you, Counsel. Thank you. We appreciate your arguments this morning. An interesting case. Thank you. And the matter is submitted at this time. Thank you. What time do you think we'll be done tomorrow? We have four cases to go. Starting at 9, right? Yeah. And the other two are under submission. Yeah. Richie, can we take a 10-minute break? Yeah, let's take – we're going to – we're going to take – the panel is going to take a 10-minute break. All rise.
judges: Paez, Bea, Jack